## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **GERALD JONES,** | |
| **Plaintiff,** | |
| **v.** | **Case No. 25-cv-2017-NJR** |
| **KENNETH HALL, ANTHONY WILLS, ERIN NICHOLSON, AMANDA CHOATE, CARRI MORRIS, MR. WILLIAMSON, C/O ETHLER, SGT. BERRY, C/O APPEL, C/O GARRETT, MR. DAVIS, C/O KULICH, BRENDAN GARCIA, JOHN DOE LIEUTENANT, JOHN DOE FIVE GALLERY OFFICER, JOHN DOE CONSTANT WATCH OFFICER, CENTURION HEALTH SERVICES, JOHN DOE PSYCHIATRIST, JOHN DOE SHIFT LT., JOHN DOE GRIEVANCE OFFICERS, LT. WINE, JOHN DOE SERGEANT "A", C/O BARTTLEBOLT, MR. JOHNSON, MR. REICHERT, and MR. LYNCH,** | |
| **Defendants.** | |

## MEMORANDUM AND ORDER

**ROSENSTENGEL, Chief Judge:**

Plaintiff Gerald Jones, an inmate of the Illinois Department of Corrections who is currently incarcerated at Menard Correctional Center, brings this action for deprivations of his constitutional rights pursuant to 42 U.S.C. § 1983. In the Complaint, Jones alleges that Defendants were deliberately indifferent to his mental health needs, as well as his safety, all in violation of the Eighth Amendment.

1

This case is now before the Court for preliminary review of the Complaint pursuant to 28 U.S.C. § 1915A. Under Section 1915A, the Court is required to screen prisoner complaints to filter out non-meritorious claims. *See* 28 U.S.C. § 1915A(a). Any portion of a complaint that is legally frivolous, malicious, fails to state a claim upon which relief may be granted, or asks for money damages from a defendant who by law is immune from such relief must be dismissed. 28 U.S.C. § 1915A(b).

### *In Forma Pauperis* Motion

Section 1915(g) prohibits a prisoner from bringing a civil action or appealing a civil judgment *in forma pauperis* ("IFP"), "if the prisoner has, on 3 or more prior occasions, while incarcerated or detained in any facility, brought an action or appeal in a court of the United States that was dismissed on the grounds that it is frivolous, malicious, or fails to state a claim upon which relief may be granted, unless the prisoner is under imminent danger of serious physical injury." *See* 28 U.S.C. § 1915(g). A review of documents filed in the electronic docket of this Court and on the Public Access to Court Electronic Records ("PACER") website (www.pacer.gov) reveals that Jones has had at least three cases which were dismissed on the grounds that they were frivolous, malicious, or failed to state a claim upon which relief may be granted. *See Jones v. Sternes, et al.*, Case No. 02-50415 (N.D. Ill. Feb. 14, 2003) (dismissed for failure to state a claim); *Jones v. Sternes, et al.*, Case No. 04-50058 (N.D. Ill. Feb. 9, 2004) (dismissed for failure to state a claim); and *Jones v. Sternes*, Case No. 04-1621 (7th Cir. Feb. 18, 2005) (dismissed as frivolous).

Jones did not use the standard form for this district when filing his original Complaint and, therefore, he was not explicitly instructed to disclose his litigation

history. His Complaint does, however, list his previous lawsuits but fails to indicate whether he received a strike for any of the cases. Jones does seem to acknowledge that he has three strikes because he includes a section in his Complaint arguing that he faces imminent danger (Doc. 1, pp. 46-51). Because Jones has three strikes, he is prohibited from proceeding without prepayment of the filing fee unless he demonstrates that he is in imminent physical danger.

The Seventh Circuit has explained that "imminent danger" requires a "real and proximate" threat. *See Ciarpaglini v. Saini*, 352 F.3d 328, 330 (7th Cir. 2003). Allegations of past harm are not sufficient to state imminent danger; "the harm must be imminent or occurring at the time the complaint is filed." *Id.* The imminent danger exception to Section 1915(g)'s "three strikes" rule is available for genuine emergencies, where time is pressing, the threat is "real and proximate, and when the potential consequence is 'serious physical injury'...." *Lewis v. Sullivan*, 279 F.3d 526, 531 (7th Cir. 2002). Additionally, courts "deny leave to proceed IFP when a prisoner's claims of imminent danger are conclusory or ridiculous." *Ciarpaglini*, 352 F.3d at 331 (*citing Heimermann v. Litscher*, 337 F.3d 781, 782 (7th Cir. 2003)).

Here, Jones alleges that he is in imminent danger, because he suffers from numerous psychological conditions including post-traumatic stress disorder, depression, impulse and personality disorders, and poor coping skills (Doc. 1, p. 46). He is also prone to self-harm. Jones alleges that he is refusing housing; specifically, he refuses to leave segregation and go to either general population or protective custody. As a result of his refusal of housing, Jones is subject to a new prison policy subjecting him to a "strip-out"

where he loses all of his property (*Id.* at pp. 46-47). Defendants also have placed him in unsanitary cells. Jones alleges that Defendants have subjected him to these conditions in an effort to exacerbate his mental conditions; he specifically notes that several individuals have indicated that they intend to subject him to these conditions until he kills himself (*Id.* at p. 47).

In Jones's recently filed motion for an emergency preliminary injunction and temporary restraining order (Doc. 4), Jones further explains his conditions. Jones alleges that he has been faced with a false choice: he can either transfer to general population and be placed in danger of assault by inmates who are likely to assault him due to his nickname and past criminal conviction or he can be subject to a strip-out (loss of property) and placement in an unsanitary cell (*Id.* at p. 1). It is not entirely clear from either pleading where Jones is currently housed, whether in disciplinary segregation, crisis watch, or general population/protective custody. He merely states that he faces imminent harm if he is transferred. And he notes that he is subject to the strip-out policy every three to four weeks (Doc. 1, p. 47). At this stage, the Court finds that Jones has demonstrated he is possibly in imminent danger. Thus, the Court will allow Jones to proceed *in forma pauperis* under the imminent danger prong of Section 1915(g), but as the Seventh Circuit has previously warned Jones, the decision only allows him to start his lawsuit without prepayment of fees. *See Jones v. Burle*, 2022 WL 4008712 (7th Cir. 2022). If any defendant challenges the allegations of imminent danger, or the Court learns that the allegations are ultimately untrue, Jones may be required to pay the full filing fee or face dismissal of his

claims. *Id*.[1] He may also incur a sanction for filing a case that does not ultimately qualify for the imminent danger prong of Section 1915(g).

## The Complaint

On July 30, 2023, Jones transferred to Menard as the result of a staff assault. Upon arrival at Menard, Jones alleges that he was beaten by guards and threatened by officers (Doc. 1, p. 5). Specifically, he alleges that Mr. Kulich threatened him by stating that he would not receive anything while at Menard, including showers and yard (*Id*). Mr. Garcia also threatened to place Jones in a cell with an inmate who would allegedly sexually assault him (*Id*.). Since the July 2023 assault, Jones alleges he has filed numerous grievances as well as a lawsuit about threats to his safety (*Id*. at p. 6). *See Jones v. Willis, et al*., Case No. 23-cv-02804-DWD (filed Aug. 18, 2023). After that lawsuit was dismissed, Jones alleges that he has received more threats, harassment, and harm from officials at Menard (*Id*.).

On June 29, 2025, Jones filed two grievances informing Warden Wills, Warden Reichert, and John Doe Grievance Officers that the brother of Jones's murder victim was housed at Menard and would kill him if he was transferred to general population (Doc. 1, p. 6). He also informed officials that inmates think he is gay (given that his nickname is Ladybug), placing him at risk of assault if transferred to general population (*Id*.). His

---

[1] Jones also recently filed another case, alleging imminent danger and seeking injunctive relief. *See Jones v. Hughes*, Case No. 25-cv-01317-SMY (filed July 2, 2025). If it is shown that Jones is filing numerous, false claims of imminent danger, he may also be subject to sanctions for abusing the imminent danger exception.

grievances further noted that he previously received threats from numerous inmates, as well as threats from Kulich and Garcia to place him in general population in order to have another inmate attack him (*Id*. at p. 7). He requested protection in the form of a transfer out of Menard.

Jones alleges that Warden Wills and the grievance officers ignored the risks of harm posed by Jones's allegations and, instead, designed a scheme to force Jones to leave disciplinary segregation and risk his life in general population or protective custody (Doc. 1, p. 7). They labeled his grievance not an emergency (*Id*.). On August 28, 2025, Officer Farrar informed Jones that he was being moved to general population (*Id*. at p. 8). Farrar threatened that if Jones refused his placement, he would lose all of his personal property (*Id*.). Jones requested a crisis team and argued that there was no policy requiring that he lose his property if he refused housing (*Id*.). Farrar refused Jones's request for a crisis team but told him that the next time he refused housing he would lose his property.

In response to the threats from Farrar, on September 6, 2025, Jones filed another emergency grievance to Warden Wills and the grievance officers. He informed the grievance officers that Farrar, acting on the authority of Kulich, threatened to take Jones's property (Doc. 1, p. 8). Jones believed this was part of a scheme to force him to leave disciplinary segregation and have him assaulted or killed by another inmate. The officers' actions were also an attempt to exacerbate Jones's mental illness in order to cause him to self-harm (*Id*.). The grievance was again deemed not an emergency (*Id*. at p. 9). Jones alleges that he failed to receive a timely response to the grievances in violation of

administrative code, an act that allegedly interfered with his ability to exhaust his claims (*Id.* at pp. 9-10).

Jones further alleges that Defendants created the strip-out policy as punishment in order to harass, retaliate, and inflict emotional distress on him, by threatening to take his property if he refused housing. Jones also alleges that the policy violated his due process rights (Doc. 1, p. 10). Jones alleges that Farrar's threats to confiscate his property were made on behalf of all the defendants. Jones also contends that there was no formal policy regarding the strip-out, nor was he provided with notice of such a policy (*Id.*).

On September 26, 2025, Kenneth Hall informed Jones that he was again moving to general population in Easthouse (Doc. 1, p. 11). Jones stated that he was refusing to leave disciplinary segregation. Later that day, an unknown Lieutenant informed Jones that he was being taken for a mental health evaluation and was being stripped of all his property pursuant to a new policy for inmates who refused housing (*Id.*). Mr. Williamson escorted Jones to Ms. Nicholson in mental health for an evaluation (*Id.*). Jones informed Nicholson that he could not be placed in general population because his victim's brother was also in Menard and would direct his gang to kill Jones in retaliation for his brother's death (*Id.*). Mr. Williamson indicated that he could request protective custody status (*Id.* at p. 13). Jones informed Nicholson that due to his nickname, Ladybug, he has a lot of enemies who threaten to assault him because they believe he is homosexual (*Id.* at p. 13). Thus, Jones believed that any cellmate, even in protective custody, would try to assault him on the belief he was homosexual based on his nickname (*Id.*). He also informed

Nicholson that two officers in the cellhouse had previously threatened to place him in a cell with an inmate that would assault him (*Id*.).

After speaking with Nicholson, Williamson escorted Jones back to his original cell (Doc. 1, p. 14). Williamson informed Jones that he was on their list, and "when we [are] ready to kill you it's going to happen" (*Id*.). He asked Jones if he thought his former lawsuit changed anything. Upon returning to his cell, Jones discovered that all of his property was gone except for a mattress. This included the loss of his personal items, as well as toilet paper, sheets, towels, and other hygiene items (*Id*. at p. 58). He informed Williamson that he was in crisis and needed to speak with the crisis team (*Id*. at p. 14). Williamson acknowledged his request and walked away.

Jones began yelling out to the gallery officers, including Mr. Hall, Mr. Ethler, Mr. Williamson, and an unknown Lieutenant (Doc.1, p. 14). He stated he was in crisis and had thoughts of self-harming (*Id*.). After repeating his claims four times, he started cutting his right arm with an ink pen (*Id*.). Jones yelled that he was bleeding and needed a crisis team (*Id*. at p. 15). Mr. Hall, an unknown Lieutenant, and Mr. Ethler stopped at his cell, looked at his bleeding arm and told Jones to kill himself (*Id*.). They refused to obtain medical treatment or call a crisis team from 1:40 a.m. until the 3:00 a.m. shift change (*Id*. at pp. 15-16). He alleges these officers, along with Nicholson and Wills, created and enforced the strip-out policy that confiscated everything except his mattress and clothes due to his refusal to leave segregation (*Id*. at p. 16). He alleges that visiting Nicholson was merely a ruse because the policy was designed to exacerbate his mental illness, and his evaluation was designed to cover up those actions (*Id*. at p. 17). He further

alleges that Nicholson knew that the loss of property would further injure his mental health because his property was his only coping mechanism; she allegedly conspired with Warden Wills because they both knew that his mental health treatment plan involved finding coping mechanisms (*Id*.).

At shift change, Jones informed Correctional Officers Quann and Korando of his mental breakdown, and they escorted him to medical staff (Doc. 1, p. 18). Jones received stitches and was placed on crisis watch (*Id*.). On September 27, 2025, Nicholson informed Jones that, per policy, he could not leave crisis watch or move to a step-down watch due to it being the weekend (*Id*.). He would have to wait until Monday to step-down to a 15-minute watch. As a result of the policy, Jones expected to be placed on a 15-minute watch on Monday, followed by a 30-minute watch on Tuesday, and be released from watch on Wednesday (*Id*.). On October 1, 2025, Nicholson refused to release Jones from crisis watch until he spoke to a psychiatrist, again per new prison policy (*Id*. at p. 19). Jones was scheduled to see the psychiatrist on October 6, 2025 (*Id*.).

Jones disputed that he had to talk to a psychiatrist and accused Nicholson of attempting to provoke Jones to self-harm (Doc. 1, p. 19). He refused mental health services, noting that he was not in danger of self-harm (*Id*.). Jones alleges that Nicholson responded that he would not be on watch if he had killed himself (*Id*.). Jones yelled that he wanted to write an emergency grievance and speak to internal affairs (*Id*.). He also informed Nicholson that he needed a bandage change and to speak to someone about his pain (*Id*.). Nicholson indicated that she would inform staff about his concerns and requests (*Id*.). Jones alleges that Nicholson worked with Ms. Morrison, Mr. Wills, John

Doe Psychiatrist, Centurion Health Services, and Mr. Davis to create and enforce the step-down requirements which kept Jones on crisis watch longer than was necessary (*Id.* at p. 20). He believes this policy went against professional standards and was in violation of the prison's own policies (*Id.*). Jones's prolonged placement on crisis watch caused him physical pain in his back, neck, legs, arms, hips, shoulders, and eyes due to the conditions of his cell and limited clothing (*Id.* at p. 21). His placement also prolonged his thoughts of self-harm and exacerbated his mental health conditions (*Id.*).

On October 1, 2025, Mr. Appel and John Doe authorities and lieutenants moved Jones to Cell 518 as an act of retaliation (Doc. 1, p. 21). Jones alleges the cell was flooded with water, urine, and feces, and smelled of mold (*Id.*). Jones threatened to self-harm, and he was again moved to Cell 505 (*Id.*). On October 2, 2025, Jones informed his counselor that he wanted to file an emergency grievance because of his continued placement on crisis watch and his cell conditions (*Id.*). The counselor informed him that the officer or an inmate worker could draft the grievance for him because he was on crisis watch (*Id.* at p. 22). Jones informed Davis that he wanted to write a grievance. On October 3, 2025, Counselor Baker escorted Jones to an interview room in order to draft a grievance (*Id.*). He directed Baker to draft a grievance stating that Mr. Hall, "the sergeant," the lieutenant, and Mr. Ethler confiscated his property, refused his request for a crisis team, watched him self-harm, refused to take him off of crisis watch, and tried to place him on psychiatric medication that Jones believed would kill him (*Id.* at pp. 22-23).

Jones alleges that in retaliation for that grievance, Mr. Baker, Mr. Hall, Mr. Berry, and Mr. Dillman refused to feed him lunch (Doc. 1, p. 23). After returning to his cell from

talking to Baker, Dillman indicated he would obtain a lunch tray as the tray was not in his cell upon his return (Doc. 1, p. 23). Jones later spoke to Mr. Berry, who also indicated he would obtain a tray (*Id*.). Dillman returned and informed Jones that staff said he already received a tray prior to his transfer to the interview room (*Id*.). In response, Jones demanded a crisis team, indicating that he would self-harm due to the failure to obtain a tray (*Id*.). Dillman and Hall removed Jones from the cell (*Id*.). Hall informed Berry that he placed a tray on Jones's bed, a comment Jones contends was a lie (*Id*.). Dillman indicated that Hall told him Jones ate before speaking with the counselor (*Id*. at p. 24). Jones contends that Berry knew the other two officers were lying but conspired to turn a blind-eye to their lies (*Id*.). Mr. Davis approached, and Jones informed him that the officers refused to feed him, and he believed he was being provoked to self-harm (*Id*.). Davis indicated that he would try to obtain a tray for Jones (*Id*.). Hall returned Jones to his cell, but Jones grabbed a paperclip and started cutting himself (*Id*.).

Dillman saw Jones self-harming and called Hall over to the cell. Hall spoke with Dillman, who started to spray Jones with mace (*Id*. at p. 25). Jones tried to block the assault with a blanket (*Id*.). When Hall directed him to put the blanket down, Jones tried to block his box slot with the blanket, prompting additional mace from Dillman (*Id*.). Hall then sought to cuff Jones but slammed the slot closed on Jones's hand and fingers (*Id*.). He then escorted Jones to the healthcare unit (*Id*.). Mr. Williamson noted that he was cut up good, and Dillman indicated he tried to use the whole can of mace (*Id*.). Hall instructed Ms. Choate to wrap up Jones's injuries, noting that he was tired of Jones filing grievances (*Id*. at p. 26). Choate noted that she had to report the incident because Jones needed

11

stitches (*Id.*). Choate asked Jones why he cut himself, and Jones noted that the officers refused to feed him and left a paperclip on the bed (*Id.*).

Later, Berry directed Jones to place his face in water to wash out the mace, but the water only made the symptoms worse (Doc. 1, p. 26). Jones alleges Berry did this on purpose because Defendants all laughed in response (*Id.*). Jones received stitches for his injury. He gave a lieutenant the paperclip that he used to self-harm (*Id.* at p. 27). Jane Doe Doctor stitched his cut but allegedly lied to him about prescribing Tylenol (*Id.*). Jones alleges that he never received any pain medication.

Jones returned to the housing unit and a lieutenant ordered that he be placed in Cell 507 (Doc. 1, p. 27). John Doe Five Gallery Officer noted that the cell was ready (*Id.*). Mr. Garrett escorted him to the cell with four other unknown officers (*Id.*). Garrett told John Doe Five Gallery Officer to pull the mattress out of the cell (*Id.* at p. 28). Jones alleges the mattress had feces on it and the cell smelled of urine and feces (*Id.*). The toilet was filled with excrement and had bugs in it (*Id.*). The sink and toilet were turned off (*Id.*). There was excrement and bugs throughout the cell (*Id.*). Jones choked on the strong smell (*Id.*).

Jones was placed on constant watch due to his mental health status (Doc. 1, p. 29). The John Doe Watch Officer sat outside the cell (*Id.*). Jones asked the officer to move him from the cell. He informed the officer that he was looking for something to use to self-harm, but he did not want to cut himself if he could be moved (*Id.*). The officer indicated that he could not move Jones (*Id.*). In response, Jones discovered some rusty pieces on the bed frame and used the pieces to cut himself (*Id.*). He then wrote a message on the wall

12

with his blood while John Doe Watch Officer, John Doe Five Gallery Officer, and Mr. Garrett watched (*Id*.). After 40 minutes, the officers escorted Jones to a holding cell (*Id*. at p. 30). An unknown sergeant inquired as to why Jones did not just kill himself (*Id*.). Another officer threatened him (*Id*.). Mr. Mercer directed the officers to take Jones to the healthcare unit. Garrett directed Jones to kill himself next time (*Id*.). The sergeant noted that they did not care about his mental or physical health (*Id*. at p. 31).

Jones was examined by an unknown doctor who transferred him to an outside hospital to treat the injury (Doc. 1, p. 31). Jones received 20 stitches. Upon returning to the prison, Jones informed a nurse that he did not want to self-harm, but officers refused to remove him from the cell after asking to be moved (*Id*.). He informed the nurse that he would have to do something worse to himself (*Id*.). He also informed the nurse of the conditions in the cell, including the rusty metal on the bed frame that he used to cut himself (*Id*. at p. 32). Although the nurse tried to get Jones housed in the healthcare unit, she later informed him that he was going back to segregation (*Id*.). Jones believes the nurse failed to take the necessary steps to keep him out of the segregation cell (*Id*.).

Mr. Garrett and Mr. Quann escorted Jones back to the segregation cell. Quann noted that the toilet and water were turned on, the cell was mopped, and the bed was in the cell. He also noted it was the only cell they currently had available (*Id*.). Garrett informed Jones that a note was left for day shift to move him to another cell. Jane Doe Nurse overheard the conversation and asked if Jones would be okay tonight, and he replied that he would be okay if the conditions were as stated (*Id*. at p. 33). Upon returning to the cell, Jones noted that the blood was washed off the walls and floor and

the water was turned back on (*Id*.). Jones alleges that the cell was still covered in feces and insects (*Id*.). Jones slept in the cell.

On October 6, 2025, Jones informed Mr. Davis about the events of October 3, 2025 (Doc. 1, p. 34). Davis noted that he would talk to the lieutenant and asked about Jones's mental state and thoughts of self-harm (*Id*.). Jones noted that he was supposed to be moved and noted the metal pieces that were available to use to self-harm (*Id*.). Jones remained in the cell (*Id*.). On that same day, Jones spoke to John Doe Psychiatrist about everything that had happened to him, including the incidents of self-harm (*Id*. at pp. 34-35). He requested medication and removal from his cell (*Id*. at p. 35). The psychiatrist noted that Jones did not need medication, but pursuant to the new policy he could now come off of crisis watch (*Id*.). Jones alleges that the psychiatrist acted with deliberate indifference in failing to prescribe medication and failing to immediately remove him from the cell (*Id*.).

On October 8, 2025, Jones informed Mr. Davis that he could easily bend the metal pieces on the frame until they broke and use the pieces to self-harm (Doc. 1, p. 36). He threatened to self-harm if his cell was not cleaned, or he was denied a transfer to another cell (*Id*.). Davis asked to see the pieces and told Mr. Barttlebolt about the bed frame (*Id*.). Jones demonstrated his ability to remove a metal piece from the bed frame (*Id*.). Davis indicated he would talk to the lieutenant. Jones was removed from the cell and placed in another cell (*Id*.). Jones believes the move was done to coverup his intentions to self-harm (*Id*.).

14

On October 9, 2025, Mr. Davis informed Jones that he could not be removed from watch because Ms. Morris pushed his watch time back to a 15-minute watch because Jones had to be moved from the cell. Ms. Morris wanted to make sure that he did not self-harm after his transfer, and he could be released from watch the following day (*Id.* at p. 37). Jones believes that Morris, Nicholson, and Davis made excuses to keep him on watch (*Id.*). He informed them that he was refusing mental health services and ordered that he be removed from crisis watch as he did not intend to self-harm (*Id.*). Davis noted that it was Ms. Morris's decision, and he could be released the following day (*Id.*). On October 10, 2025, Jones was released from crisis watch (*Id.*).

Jones was informed that there were no cells open for his transfer, and he would have to remain in his current cell (Doc. 1, p. 37). Jones alleges that Hall, John Doe officers, sergeants, and lieutenants refused to give him his property taken on September 26, 2025 (*Id.* at p. 38). On October 11, 2025, Jones requested a cell transfer and the return of his property. Mr. Hall told him that he was still under the strip-out policy and to cut his throat (*Id.*). Hall noted that the next time he filed a grievance Jones should spell his name properly. Thus, Jones alleges Hall's actions were in retaliation for his earlier emergency grievance (*Id.*).

On October 12, 2025, Jones was moved to another cell (Doc. 1, p. 38). Mr. Hunter returned his property, but Jones alleges that his papers were in disarray, and it was difficult to sort through them. Some documents were missing or misplaced, and his pornographic material had been stolen (*Id.*).

On October 14, 2025, Jones filed a grievance about all of the events he recently experienced. He alleges that Wills and John Doe grievance officers refused to respond to the grievance (*Id.* at p. 39). On October 20, 2025, Mr. Barker returned a receipt for the grievance he filed for Jones while on crisis watch (*Id.*). The grievance was sent to Wills to determine if it would be treated as an emergency. Jones alleges that officials failed to respond to this grievance.

Jones alleges that Defendants conspired to create the strip-out policy, causing him to lose all of his property including basic items such as toilet paper, hygiene items, sheets, and a blanket. He alleges this policy was created to force him into general population or protective custody and place him at risk of harm from other inmates (Doc. 1, pp. 39-42). He also alleges that policy was enacted to cause him severe emotional distress (*Id.* at p. 42). He believes it was also instituted in retaliation for previous lawsuits and grievances that he filed after his transfer to Menard (*Id.* at p. 43).

Jones also contends that Defendants conspired to place him in unconstitutional conditions of confinement in the various cells he was placed in while in disciplinary segregation and on crisis watch (Doc. 1, p. 43). He believes the strip-out policy caused additional unconstitutional conditions because he lacked access to toilet paper, sheets, blankets, and hygiene (*Id.*). He believes all of this was done without due process protections (*Id.* at pp. 43-44). Jones alleges that he received a disciplinary report for refusing housing, but his property was taken from him without a hearing (*Id.* at p. 44). He believes he was also moved to Two Gallery because it is known as the gallery where inmates are refused food, showers, and yard, as well as has the harshest conditions (*Id.*

16

at p. 45). Jones alleges that Defendants continue to conspire to place him in harmful conditions and continue to retaliate against him, despite his deteriorating mental health (*Id.*).

## Preliminary Dismissals

To survive preliminary review under Section 1915A, a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief," FED. R. CIV. P. 8(a)(2), which includes "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The complaint must associate specific individuals with specific claims, so that Defendants are put on notice of the claims brought against them and they can properly answer the complaint. *Id.* at 555.

Jones's Complaint alleges a vast conspiracy among numerous officials at Menard to confiscate his property, retaliate against him, place him in unsanitary cell conditions, use excessive force against him, and ignore his deteriorating mental health. Jones attempts to tie his various claims together by alleging that Defendants conspired with each other to implement policies as well as take specific actions against him. But his numerous allegations that Defendants "conspired" to violate his rights is a legal conclusion and does not state a claim. Further, each Defendant must be personally involved in the constitutional violation. *Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995) ("To recover damages under [Section] 1983, a plaintiff must establish that a defendant was personally responsible for the deprivation of a constitutional right."). Jones's statements that a particular defendant conspired with the individuals who

actually participated in the alleged violation is not enough to state a claim. *Brooks v. Ross*, 578 F.3d 574, 580 (7th Cir. 2009) (noting that a plaintiff must connect each specific defendant to the illegal act). Jones lists a number of individuals as defendants who he either fails to include any claims against in his statement of claim or alleges they participated in the constitutional deprivations by "conspiring" with other defendants. These include conclusory allegations against Mr. Wine, Lynch, Johnson, and Reichert. His conclusory statements are not enough to state a claim against these individuals, and they are **DISMISSED without prejudice**.

Jones also refers to Kulich and Garcia, noting that they were defendants in his previous case and that other defendants conspired to transfer Jones to their units (Doc. 1, p. 52). But he fails to allege that the two were personally involved in any of the alleged events in this case. There are no allegations suggesting they were involved in the strip-out policy, Jones's transfer to crisis watch, or the conditions of the cells in which Jones was placed. Thus, any claim against Garcia and Kulich is **DISMISSED without prejudice**.

By seeking to allege a vast conspiracy, Jones appears to be attempting to tie numerous, unrelated claims together. He alleges that various defendants denied him meals, that he was transferred to a different cell by Appel for retaliatory purposes, various officials created a crisis watch step-down policy that kept him on crisis watch longer than he felt necessary, officers used excessive force against him, medical officials failed to properly treat his injuries, he was subjected to unsanitary conditions in certain cells, and various officials were deliberately indifferent to his mental state and attempts

18

to self-harm. His numerous claims raise issues with proper joinder. FED. R. CIV. P. 18-21. *George v. Smith*, 507 F.3d 605, 607 (7th Cir. 2007). Many of these claims could give rise to a constitutional violation, but there are so many potential claims and defendants, that the claims cannot all proceed in one lawsuit. Many of the claims would be subject to severance. But rather than try to sort through all of the potential claims raised in Jones's 76-page complaint and sever each into a new case, the Court has instead chosen to focus on the main and most concerning claim in Jones's complaint: the implementation of the strip-out policy and the immediate effects of that policy as experienced by Jones on September 26, 2025. These allegations are of a serious nature and, as Jones makes clear, he is potentially subject to the loss of property every time he refuses housing. All other, unrelated claims are considered **DISMISSED without prejudice**.

Jones refers to a number of individuals throughout his lengthy pleading that he fails to identify as defendants in the case caption. *See* FED. R. CIV. P. 10(a); *Myles v. United States*, 416 F.3d 551, 551–52 (7th Cir. 2005). In order to be a party in the case, a plaintiff must identify them in the case caption. *Myles*, 416 F.3d at 551-52. Because Jones fails to identify Farrar, Quann, Baker, Dillman, Jane Doe Doctor, Jane Doe Nurse, Mr. Hunter, Mr. Mercer, Hughes, and Holgrefe as defendants in his case caption, any potential claim against them is **DISMISSED without prejudice**.

Finally, Jones identifies a number of John and Jane Doe defendants throughout his lengthy pleading. He identifies John and Jane Doe medical, mental health, grievance officials, and security staff. He refers to John Doe Sergeants and Lieutenants throughout the pleading. A lieutenant is mentioned at various points in his Complaint, but it is not

clear if this is the same lieutenant or if Jones is referencing numerous individuals who he saw while on crisis watch. Although Jones may certainly proceed against unknown officials, he must identify them with specificity (*i.e.*, John Doe #1 officer, John Doe #2 sergeant, etc.). His reference to various staff, lieutenants, sergeants, and officers is too vague to survive threshold review because he fails to describe each individual involved or even state the number of them. Thus, any claim against these unknown officials is **DISMISSED without prejudice**.

### Discussion

Based on the allegations in the Complaint, the Court designates the following counts:

**Count 1:**     **Eighth Amendment cruel and unusual punishment and/or conditions of confinement claim against Kenneth Hall, Williamson, Erin Nicholson, and Anthony Wills for implementing and subjecting Jones to the strip-out policy when he refused housing.**

**Count 2:**     **First Amendment retaliation claim against Williamson and Hall for denying Jones access to his personal property and hygiene items in retaliation for Jones's lawsuits and grievances.**

**Count 3:**     **Eighth Amendment deliberate indifference claim against Hall, Williamson, Ethler, Nicholson, and Wills for subjecting him to the strip-out policy and ignoring his requests for a crisis team.**

**Count 4:**     **Eighth Amendment failure to protect claim against Hall, Williamson, Nicholson, and Wills for subjecting Jones to a choice between a possible assault in general population or losing all of his hygiene items.**

**Count 5:**     **Illinois state law claim for intentional infliction of emotional distress against Hall, Williamson, Nicholson,**

> **and Wills for subjecting Jones to the strip-out policy and depriving him of all personal property and hygiene items.**

The parties and the Court will use these designations in all future pleadings and orders, unless otherwise directed by a judicial officer of this Court. **Any other claim that is mentioned in the Complaint but not addressed in this Order should be considered dismissed without prejudice as inadequately pled under the** *Twombly* **pleading standard.**[2]

**Count 1**

At this stage, Jones alleges a viable Eighth Amendment claim against Defendants for subjecting him to the strip-out policy. Jones alleges that due to his refusing placement in general population, he was stripped of all property except his mattress. He was left without basic hygiene items, including toilet paper, soap, and water. These allegations are enough to state a viable Eighth Amendment conditions of confinement claim.[3]

**Count 2**

Jones also alleges a viable retaliation claim against Hall and Williamson. He specifically alleges that both officers noted his prior lawsuits and grievances when

---

[2] *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007) (an action fails to state a claim upon which relief can be granted if it does not plead "enough facts to state a claim to relief that is plausible on its face").

[3] Jones's allegations do not, however, state a claim for violation of his due process rights under the Fourteenth Amendment. The Seventh Circuit has found that Illinois provides an adequate post-deprivation remedy in an action for damages in the Illinois Court of Claims for claims involving loss of property. *Murdock v. Washington*, 193 F.3d 510, 513 (7th Cir. 1999); *Turley v. Rednour*, 729 F.3d 645, 653 (7th Cir. 2013) (recognizing that the "Court of Claims has consistently awarded prisoners "back pay" when they were denied their stipend during unlawful confinement in segregation."). Thus, the state provides an adequate remedy for his loss of property and he cannot maintain a civil rights claim. *Hudson v. Palmer*, 468 U.S. 517, 530-36 (1984).

confiscating and later returning his property, suggesting that Jones was subjected to the strip-out policy in retaliation for his previous filings. But Jones only alleges in conclusory fashion that other defendants, including Wills, sought to retaliate again him by conspiring with others to harass or attack Jones (Doc. 1, pp. 62-63). His conclusory allegations are not enough to state a viable retaliation claim against any other defendant.

**Count 3**

Jones also states a viable deliberate indifference claim in Count 3. He alleges that Ethler, Hall, and Williams watched as he self-harmed after his property was confiscated. They ignored his requests for a crisis team prior to his injury and failed to obtain medical care for him after he self-harmed. Although neither Wills nor Nicholson were present during the event, Jones alleges that they created the strip-out policy, were aware of his mental health issues and triggers, and knew the enforcement of the policy would affect his mental health (Doc. 1, p. 59). Thus, Count 3 shall proceed against all Defendants.

**Count 4**

Jones also states a viable failure to protect claim. Jones alleges that Defendants forced him to choose between transferring to general population and/or protective custody or remain in segregation and be subjected to the strip-out policy. *See Perkins v. Givens*, 688 F. App'x 397, 399 (7th Cir. 2017) (prison officials could violate the Eighth Amendment if they offer a prisoner requesting protective custody the "Hobson's choice [of] ... protection in the form of disciplinary segregation or no protection at all") (*citing Gevas v. McLaughlin*, 798 F.3d 475 (7th Cir. 2015)). Jones alleges that he informed officers that he faced real threats in general population from his victim's brother and

officers Garcia and Kulich, as well as additional threats in protective custody from gang members who thought he was a homosexual. Instead, officials required him to choose between being placed in cells where he possibly faced assault or refuse housing and be subjected to the strip-out policy. Such a choice could violate the Eighth Amendment.

**Count 5**

Finally, Jones alleges a viable intentional infliction of emotional distress claim under Illinois law against defendants.

## Motion for Preliminary Injunction or Temporary Restraining Order ("TRO")

Jones's request for relief seeks an injunction restricting Defendants from using the strip-out policy against Jones for his refusal of housing in general population, as well as prohibiting the confiscation of all hygiene items (Doc. 1, p. 76). In a recently filed motion for a preliminary injunction or TRO, Jones alleges that he still faces real threats if he is transferred to general population or protective custody but continues to face possible punishment through the prison's strip-out policy if he refuses housing (Doc. 4, p. 6). Jones alleges that continuing issues regarding his safety has amplified his anxiety and depression (*Id.*). He further alleges that he was subjected to the strip-out policy again on October 25, 2025, losing all hygiene items for seven days (*Id.* at p. 9). As a result, he lost access to toilet paper, sheets, and other hygiene items. Although Jones does not indicate when he next faces a choice between accepting housing and losing all hygiene items, Jones alleges he faces placement decisions every 25 to 29 days (*Id.* at p. 11). He seeks treatment for his finger, an order enjoining defendants from subjecting Jones to the strip-

out policy if he refuses housing, a transfer from Menard, and a response to his pending grievances.

At this stage, the Court finds it appropriate to direct Warden Anthony Wills to provide a response to the allegations in Jones's motion for injunctive relief as it relates to his current placement and implementation of the prison's strip-out policy. Specifically, Wills should focus on providing the Court with information about the prison's strip-out policy, Jones's current placement inside the prison, whether or not he is scheduled for placement in general population, and Jones's current access to basic hygiene items such as toilet paper, soap, and water. Although Jones's motion discusses many other topics in addition to his placement, the Court directs only a narrow response on these topics as Jones's other allegations relate to claims that have been dismissed from this lawsuit.[4]

Accordingly, Defendant Anthony Wills will be served, and he is **DIRECTED** to respond to the pending motion for injunctive relief, as discussed above, within **14 days** of returning an executed waiver of service of process.

## Disposition

For the reasons stated above, Count 1 shall proceed against Kenneth Hall, Williamson, Erin Nicholson, and Anthony Wills. Count 2 shall proceed against Hall and Williamson. Count 3 shall proceed against Hall, Williamson, Ethler, Nicholson, and Wills.

---

[4] To the extent Jones alleges that he is being denied medical care for an injured finger, the claims related to that injury are not currently a part of this lawsuit. The Court previously noted that the incident which led to this injury was unrelated to the claims regarding the strip-out policy. Thus, to the extent Jones seeks injunctive relief regarding this injury, he would need to file a new lawsuit.

Count 4 shall proceed against Hall, Williamson, Nicholson, and Wills. Count 5 shall proceed against Hall, Williamson, Nicholson, and Wills. All other claims and defendants are **DISMISSED without prejudice**.

The Clerk of Court shall prepare for Anthony Wills, Kenneth Hall, Erin Nicholson, Ethler, and Williamson: (1) Form 5 (Notice of a Lawsuit and Request to Waive Service of a Summons) and (2) Form 6 (Waiver of Service of Summons). The Clerk is **DIRECTED** to mail these forms, a copy of the Complaint, and this Memorandum and Order to each defendant's place of employment as identified by Jones. If a defendant fails to sign and return the Waiver of Service of Summons (Form 6) to the Clerk within 30 days from the date the forms were sent, the Clerk shall take appropriate steps to effect formal service on that defendant, and the Court will require that defendant to pay the full costs of formal service, to the extent authorized by the Federal Rules of Civil Procedure.

If a defendant can no longer be found at the work address provided by Jones, the employer shall furnish the Clerk of Court with that defendant's current work address, or, if not known, that defendant's last-known address. This information shall be used only for sending the forms as directed above or for formally effecting service. Any documentation of the address shall be retained only by the Clerk. Address information shall not be maintained in the court file or disclosed by the Clerk.

Defendants are **ORDERED** to timely file an appropriate responsive pleading to the Complaint and shall not waive filing a reply pursuant to 42 U.S.C. Section 1997e(g). **Pursuant to Administrative Order No. 244, Defendants need only respond to the issues stated in this Merit Review Order**.

Because Jones's claims involve his medical and mental health care, the Clerk of Court is **DIRECTED** to enter the Court's standard HIPAA Qualified Protective Order.

If judgment is rendered against Jones, and the judgment includes the payment of costs under Section 1915, he will be required to pay the full amount of the costs, regardless of whether his application to proceed *in forma pauperis* is granted. *See* 28 U.S.C. § 1915(f)(2)(A).

Finally, Jones is **ADVISED** that he is under a continuing obligation to keep the Clerk of Court and each opposing party informed of any change in his address; the Court will not independently investigate his whereabouts. This shall be done in writing and not later than **14 days** after a transfer or other change in address occurs. Failure to comply with this order will cause a delay in the transmission of court documents and may result in dismissal of this action for want of prosecution. *See* FED. R. CIV. P. 41(b).

   **IT IS SO ORDERED.**

   **DATED:  November 18, 2025**

_____
**NANCY J. ROSENSTENGEL**
**Chief U.S. District Judge**

## Notice to Plaintiff

The Court will take the necessary steps to notify the appropriate defendants of your lawsuit and serve them with a copy of your Complaint. After service has been achieved, the defendants will enter their appearance and file an Answer to your Complaint. It will likely take at least **60 days** from the date of this Order to receive the defendants' Answer, but it is entirely possible that it will take **90 days** or more. When all the defendants have filed Answers, the Court will enter a Scheduling Order containing important information on deadlines, discovery, and procedures. Plaintiff is advised to wait until counsel has appeared for the defendants before filing any motions, to give the defendants notice and an opportunity to respond to those motions. Motions filed before defendants' counsel has filed an appearance will generally be denied as premature. **Plaintiff need not submit any evidence to the Court at this time, unless specifically directed to do so.**