## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

GERALD JONES,

      Plaintiff,

v.

KENNETH HALL, ERIN NICHOLSON, BLAKE WILLIAMSON, JEFFREY EHLERS, ANTHONY WILLS, and MATTHEW PLUMMER (official capacity only),

      Defendants.

Case No. 25-cv-2017-NJR

## MEMORANDUM AND ORDER

**ROSENSTENGEL, District Judge:**

Plaintiff Gerald Jones, an inmate of the Illinois Department of Corrections who is currently incarcerated at Menard Correctional Center, brings this action for deprivations of his constitutional rights pursuant to 42 U.S.C. § 1983. The matter is currently before the Court on Jones's Motion for Emergency Injunction (Doc. 4) and Motion for Adequate Relief (Doc. 11). Defendant Anthony Wills, who at the time was the warden of Menard, filed a response in opposition to the request for emergency injunctive relief (Doc. 15), and Jones filed a reply brief (Doc. 20).

While the motions for preliminary injunctive relief were still pending, Jones filed a motion to add facts (Doc. 29) and a new motion for emergency injunctive relief (Doc. 30). In light of the allegations in these new motions, the Court directed the current warden of Menard, Matthew Plummer, to respond to Jones's allegations (Doc. 31). Jones subsequently filed a motion to update facts (Doc. 36) and a motion to call witnesses (Doc. 37). Warden

Plummer filed a response (Doc. 38), and Jones filed an additional notice to add facts (Doc. 39). Defendant Erin Nicholson also filed a response (Doc. 40).

On February 25, 2026, the Court held an evidentiary hearing on the pending motions.

BACKGROUND

Jones alleges that since arriving at Menard, he has faced threats in general population because the brother of his murder victim is housed there and numerous inmates think that he is a homosexual because his nickname is "Ladybug" (Doc. 5, p. 5). Jones wrote grievances informing officials of these dangers in general population and protective custody. He also informed officials that he received threats from two correctional officers who indicated they would order other inmates to attack him once he transferred to general population (*Id*. at p. 6). Despite the risk to his safety, officials have tried on numerous occasions to transfer Jones to general population (*Id*. at pp. 6-7). Their attempts have caused him to refuse housing, but he alleges that the refusal of housing subjects him to a strip-out policy created by Defendants to harass, retaliate, and inflict emotional distress on him (*Id*. at p. 7). He alleges that the policy was used against him in response to lawsuits and grievances that he filed against Defendants while at Menard (*Id*. at p. 16).

On September 26, 2025, Kenneth Hall informed Jones that he was being transferred to general population, prompting Jones to refuse housing (Doc. 5, p. 7). In response, Blake Williamson escorted Jones to Erin Nicholson for a mental health evaluation and then back to his cell where all of his property, except for his mattress, had been confiscated (*Id*. at pp. 7-8). Jones alleges that he was stripped of all personal items, including toilet paper, sheets, towels, and other hygiene items (*Id*. at p. 8). Jones informed officers Kenneth Hall, Jeffrey Ehlers, and

Williamson that he had thoughts of self-harming and did, in fact, cut his right arm with an ink pen, but the officers ignored his pleas and injuries (*Id.*).

After review of the pleading pursuant to 28 U.S.C. § 1915A, Jones was allowed to proceed on the following counts:

Count 1:   Eighth Amendment cruel and unusual punishment and/or conditions of confinement claim against Kenneth Hall, Blake Williamson, Erin Nicholson, and Anthony Wills for implementing and subjecting Jones to the strip-out policy when he refused housing.

Count 2:   First Amendment retaliation claim against Williamson and Hall for denying Jones access to his personal property and hygiene items in retaliation for Jones's lawsuits and grievances.

Count 3:   Eighth Amendment deliberate indifference claim against Hall, Williamson, Jeffrey Ehlers, Nicholson, and Wills for subjecting him to the strip-out policy and ignoring his requests for a crisis team.

Count 4:   Eighth Amendment failure to protect claim against Hall, Williamson, Nicholson, and Wills for subjecting Jones to a choice between a possible assault in general population or losing all of his hygiene items.

Count 5:   Illinois state law claim for intentional infliction of emotional distress against Hall, Williamson, Nicholson, and Wills for subjecting Jones to the strip-out policy and depriving him of all personal property and hygiene items.

(Doc. 5, pp. 20-23).

A.  **Motion for Preliminary Injunction**

With his Complaint, Jones filed a motion for an emergency injunction and temporary restraining order (Doc. 4).[1] Jones alleged that he still faces threats if he is transferred to

---

[1] Jones had three or more strikes pursuant to 28 U.S.C. § 1915(g) and could only proceed *in forma pauperis* if he demonstrated that he faced imminent danger. Jones's allegations in his Complaint and

general population or protective custody but also faces possible punishment through the strip-out policy if he refuses housing. Jones indicated that he was subjected to the strip-out policy again on October 25, 2025, resulting in the loss of his hygiene items for seven days (Doc. 5, p. 23). As a result, Jones alleged he lost access to his toilet paper, sheets, and other hygiene items. Jones noted that he was subjected to the choice between placement in general population or the loss of his hygiene items every 25 to 29 days (*Id.*).

In light of the concerning nature of Jones's allegations, the Court directed Warden Anthony Wills to respond to the issues raised in Jones's motion (Doc. 5, p. 24). Prior to Wills filing his response, however, Jones filed a motion for adequate relief (Doc. 11). Jones alleged that on November 21, 2025, he again refused housing and was subjected to the prison's strip-out policy (*Id.* at p. 1). He lost access to all of his property for eight days (*Id.*). Jones alleged that he lost his tablet, toilet paper, blanket, and sheets (*Id.* at p. 2). He alleged Defendants' actions caused him to have thoughts of self-harm, and he threatened to cut himself (*Id.* at pp. 1-2). Jones acknowledged that he received access to his toilet paper, blanket, and sheets later that same day (*Id.* at p. 2).[2]

---

motion suggested that he faced imminent danger of being transferred to general population where he faced possible assault (Doc. 5, p. 4). Or, in the alternative, if Jones refused housing, he faced danger from the loss of personal property, including basic hygiene items (*Id.*).

[2] Jones also complained of an injured finger, arguing that the Court previously overlooked the serious nature of the injury to his fingernail (Doc. 11, p. 5). Jones argued that his fingernail was only partially attached, and his finger was turning black (*Id.*). He noted that it bled often, throbbed, and was infected (*Id.*). In reviewing the Complaint pursuant to 28 U.S.C. § 1915A, the Court acknowledged that Jones complained of injuries to his finger, but those injuries were sustained as part of an incident that was unrelated to his claims regarding the strip-out policy and did not survive threshold review (Doc. 5, p. 24 n.4). The Court noted that any request for relief regarding the injuries to his finger would have to be pursued in a new lawsuit (*Id.*).

### B. Response

As ordered by the Court, on December 17, 2025, Defendant Anthony Wills filed a response to Jones's motion for injunctive relief. Wills noted that an inmate's refusal of housing does not subject him to a "strip-out" policy as Jones alleged, but that property could be confiscated if an individual was in crisis and threatened self-harm, or if the individual caused damage to his cell (Doc. 15-4, p. 2; Doc. 15-1, p. 23). Wills further noted that on September 26, 2025, Jones cut his arm with the tip of a pen (Doc. 15-4, p. 2). Jones reported to mental health staff that he cut his arm due to correctional staff taking his property (Doc. 15-2). In response, mental health staff placed him on crisis watch and directed security staff to temporarily remove his property, leaving him with one safety smock, one safety blanket, and one safety mattress (Doc. 15-4, p. 2; Doc. 15-2). Wills noted that in restrictive housing, an inmate is allowed access to certain personal property including clothes, shoes, towels and washcloths, a blanket, and hygiene items to include toothbrush and toilet paper (Doc. 15-1, pp. 17-18). Wills noted that Jones acknowledged that his personal property was returned on November 28, 2025. He further noted that if Jones refused housing placement, he would be placed in restrictive housing and subject to restrictive housing's property requirements.

Wills argued that Jones lost his personal property because he was placed on crisis watch, and those items were taken from him to protect him from self-harm. Wills argued that the policy that resulted in Jones's loss of property was designed to prevent an inmate from harming himself (Doc. 15, p. 4).

### C. Reply and Subsequent Briefing

In response to Wills's responsive brief, Jones filed numerous motions and other filings. Jones first filed a reply brief arguing that there was a strip-out policy, and the creation

of the policy was an attempt by Defendants to fulfill their threats to have him killed (Doc. 20, p. 1). Jones argued that he had been subjected to the strip-out policy on September 26, 2025, October 24, 2025, November 21, 2025, and December 19, 2025 (*Id.* at p. 2). He alleged the policy was an attempt to force him into general population where he would be killed by inmates or staff (*Id.*).

Jones argued that Wills's response supported his allegations. He noted that Wills stated there was no such policy requiring the loss of property when an inmate refused housing. Jones argued this proved his argument that Defendants created a fake policy in order to punish him. He also pointed to the mental health records where he informed mental health professionals that he was in crisis because of the loss of his personal property. Jones argued that the records substantiated his claim that his property was taken prior to his placement on crisis watch, rather than Wills's statement that the property was taken at the direction of mental health staff. He also pointed to a grievance officer's response to a previous grievance about his loss of property (Doc. 20, p. 38). In response, the grievance officer noted that because Jones refused housing, he was placed on "intake status" which resulted in the removal of his property (*Id.*). Jones further alleged that all of the inmates refusing housing were subject to the confiscation of their property (*Id.* at p. 6).

On January 23, 2026, Jones filed another document titled "notice and motion to add facts" (Doc. 29). Jones alleged that on January 16, 2026, he again refused housing in general population (*Id.* at p. 2). Jones alleged that correctional officers informed him that Wills was no longer the warden and they were not subject to Wills's declaration submitted with his response. The officers cuffed Jones, took him to mental health staff for an evaluation, and confiscated his property (*Id.*). In the healthcare unit, Jones informed mental health provider

Davis of Wills's declaration, and Davis indicated that he had to screen Jones to ensure he was not having thoughts of self-harm (*Id.* at p. 3). Jones alleged that staff at Menard continue to enforce the strip-out policy even though Wills alleged that no such policy existed (*Id.* at p. 4). Jones acknowledged that he had access to a sheet, blanket, and hygiene items, but he had to obtain paper to draft his filing from another inmate (*Id.*). He alleged that the loss of his property caused mental distress, ultimately leading him to cut his arm (*Id.* at p. 5). Jones alleged that he was refused medical care for his injuries, and officials refused to document the episode (*Id.*).

On January 29, 2026, Jones filed another motion for emergency injunction (Doc. 30), again alleging that his legal and personal property was taken on January 16, 2026, and, on January 27, 2026, he was told he would not receive his property until he agreed to leave segregation (*Id.* at pp. 1-2). Jones alleged that the loss of his property prompted him to have emotional breakdowns on January 17, 21, and 24 (*Id.* at p. 2). He noted that he was without clean underwear, clothing, socks, sheets, deodorant, or toothpaste (*Id.* at p. 3). He claimed that he was starting to smell and developed a skin rash that needed treatment (*Id.*).

On February 9, 2026, Jones submitted another notice to update the facts (Doc. 36). Although he acknowledged that he received some of his property on January 29, approximately 14 days after he was stripped of his property, Jones alleged that on January 30, 2026, he was again subjected to the strip-out policy for refusing housing (*Id.* at p. 1). He further alleged that on February 5, 2026, his property was confiscated again (*Id.* at p. 2). Jones alleged that officers escorted him to the infirmary, threatened him, and tried to intimidate him by threatening to confiscate his property on a weekly basis (*Id.*). They also threatened to one day kill him (*Id.*). Mr. Davis conducted a suicide assessment, and Jones was escorted back

to his cell where his property was taken from him (*Id.* at p. 3). Jones alleged that he was once again without his property and had to request a pen and paper from another inmate. Jones accused officers of poisoning him, noting that on both February 7 and 8, he passed out after eating dinner and fell, causing serious injuries to his face and shoulder (*Id.* at p. 4). Jones argued that it was obvious that Defendants were trying to murder him (*Id.*). He alleged officials tried to cover up their actions by labeling his injuries as a suicide attempt (*Id.* at p. 5).

On February 18, 2026, Jones filed another notice and motion for relief (Doc. 39). Jones alleged that as of February 13, he was still without the property that was confiscated from his cell on February 5, 2026 (*Id.* at p. 1). He also alleged that he requested a crisis team on several occasions due to his mental health and thoughts of self-harm, but his requests were ignored (*Id.*). Jones sought immediate relief prior to the scheduled hearing, arguing that his anger over his loss of property causes him to self-harm, and he feared he would hurt himself again before the hearing (*Id.* at p. 2). He asked that his property be returned, for medical treatment, and for protection from self-harm and threats of assault (*Id.*).

### D. Warden's Response

In light of the allegations in Jones's January notices (Docs. 29, 30) and his claim that Wills was no longer the warden of Menard, the Court directed the current warden of Menard, Matthew Plummer, to respond to Jones's newest allegations. Plummer was instructed to provide the Court with an update on Jones's current status (whether he was on crisis watch, in segregation, or in general population), as well as information regarding the January 16 incident which Jones contended led to his loss of property.

In response, Matthew Plummer stated that inmates who refuse housing or fail to comply with certain policies are placed in restrictive housing (Doc. 38-1, p. 2).[3] Derek Brandt, a lieutenant at Menard who is currently assigned to the North 2 cellhouse, stated in his affidavit that individuals in restrictive housing for refusing housing are placed there for 28 days (Doc. 38-2, p. 1). When an inmate refuses housing, his property is confiscated and inventoried to ensure there is no contraband (*Id*.). The inmate is then placed in an "intake" and "temporary confinement" status. This is according to a policy regarding "restricted property status" that requires all property be initially confiscated except for a mattress and underwear, and then returned to the inmate on a staggered basis (Doc. 38-4). On Day 2, the offender receives a toothbrush, toothpaste, a bar of soap, and face cloth. On Day 3, the offender receives clothing items, and on Day 4 he receives clean bedding (*Id*.). If after seven days the offender is cooperative with all policies, he will receive all personal property and move to an unrestricted property cell location (*Id*.). Although the policy, presented in a written memorandum from July 1, 2016, notes that the inmate will only have a mattress and underwear on the first day, Brandt stated that the offender is generally given hygiene items and a bedroll (he acknowledged that the written policy did not require those items) (Doc. 38-2, p. 2). Brandt and Plummer both acknowledged that many inmates refer to this policy as a "strip out policy" but the policy is not technically a "strip out policy" — rather it is a property restriction policy for non-compliance with policies (Doc. 38-2, p. 2). Plummer noted that

---

[3] Defendant Erin Nicholson, a mental health professional at Menard, filed a response to Jones's February 9 motion (Doc. 36), noting that she has not been involved in any of Jones's most recent evaluations or appointments with mental health staff (Doc. 40, p. 1). The mental health records do not show any recent interactions between Jones and Nicholson (Doc. 38-7).

property has to be inventoried every time an inmate, like Jones, refuses housing to ensure there is no contraband, and it is also confiscated when an inmate is non-compliant with the order to transfer to general population (Doc. 38-1, p. 3). Plummer stated that at the end of the 28-day cycle, if the individual refuses housing again, the same property policy is followed (Doc. 38-1, p. 2). The property is again confiscated and returned pursuant to the parameters outlined in the memorandum (*Id.*).

Both Plummer and Brandt acknowledged that Jones was subjected to the restricted property policy due to his continued failure to comply with policies and refusing transfer to general population (Doc. 38-1, p. 2; 38-2, p. 3). On each occasion he was given a bedroll and hygiene items (Docs. 38-1, p. 2; 38-2, pp. 2-3). They acknowledged that Jones refused housing on January 16, 2026, and February 5, 2026, resulting in the confiscation of his property (*Id.*). Jones did note an injury on February 7, 2026, but he informed medical staff his injury was the result of hitting his arm on the edge of his cot (Doc. 38-7, p. 1).

Jones is currently housed in North 2 due to his refusal of housing. Brandt noted that he has been assigned to North 2 for approximately five months, and Jones has always resided in North 2 due to his refusal of placement in general population (Doc. 38-2, p. 1). He refuses to go to general population and refuses to request protective custody; Plummer noted that Jones refuses housing in order to have a single-man cell (Doc. 38-1, p. 3). Despite being in restrictive housing, both officials stated that Jones currently has access to his property, has been seen by mental health, and has access to showers (*Id.*). The logs from restrictive housing show that Jones refused showers on January 13, 20, and 27 (Doc. 38-5, pp. 3-6).

### E. Evidentiary Hearing

At the evidentiary hearing, the Court heard testimony from Jones, Derek Brandt, Warden Matthew Plummer, and Carri Morris.

### 1. *Gerald Jones*

Jones testified that he still believes he faces threats at Menard in general population and protective custody. He testified that he believes that his victim's brother is housed at Menard, based on his knowledge from when Jones was previously housed at Menard from 1996 to 2000. He also testified that gang members from his old neighborhood recognized him. He does not know any of the individual names, he merely knows their nicknames. He could only identify his victim's brother by his nickname "Black." He also testified that his nickname outside of prison was "Ladybug" and inmates assume that he is homosexual based on his nickname. He claimed that no one wants to be cellmates with him because of his nickname. Jones has not asked for protective custody for these issues nor has he submitted a keep separate from request. Jones testified that the inmates go back and forth between general population and protective custody, so he also faces threats from those inmates if he moves to protective housing. He testified that other gangs were after him and he has been threatened since being back at Menard. He did not know the names of the individuals who issued these threats. He knew some nicknames but was hesitant to give all of the names because inmates would think he is a snitch.

Jones also testified that staff took his property on February 5, 2026. He was supposed to receive his tablet after three days and the remainder of his property on the fourth day, but at the time of the hearing his property had been missing for 14 days. Jones acknowledged that he had access to a body towel, a sheet, blanket, mattress, toilet paper, and a bar of soap.

He also had mail and court filings that he recently received. He receives hygiene items every Friday. He also acknowledged that he has been offered showers but stated that he has not taken a shower in over 20 years. He also sees mental health staff. Jones acknowledged that other inmates in his unit lost access to their property when they refused housing.

Jones denied that he had extra underwear, a toothbrush, and deodorant. He received a spare toothbrush from another inmate. He noted that he only had the jumpsuit he was wearing at the hearing, and it had blood on it where he had previously cut himself. He testified that he washes himself in the sink but his clothes stink because they have not been washed.

Jones testified that he believed that staff changed the policy regarding property because the first few times that he refused housing, he did not lose his property. After several refusals he was informed that if he kept refusing, he would lose his property. The first time he was subjected to the loss of his property was on September 26, 2025.

### 2. *Derek Brandt*

Correctional Lieutenant Derek Brandt testified that he is currently assigned to North 2 restrictive housing where he is a supervisor. He knew Jones because Jones resides in North 2, 6 Gallery in restrictive housing. Brandt noted that Jones refuses to leave restrictive housing and receives a disciplinary report for refusing his housing assignment. Every 28 days, his time in segregation expires based on the disciplinary ticket and he is scheduled to move to general population. When he refuses, he is issued a new disciplinary report and his time in restrictive housing starts over. Brandt later clarified that when an inmate refuses housing, he is removed from the cell as if he is being moved to general population, and when returned to restrictive housing, he is treated as a new intake into restrictive housing. The inmate's

property is inventoried and searched for contraband, and he is seen by medical and mental health staff. While the property is being inventoried, Brandt testified that inmates receive their bed roll items including sheets, blankets, pillow, as well as hygiene items including toilet paper, soap, toothbrush, and toothpaste. Recently, inmates have also been allowed to keep their tablets during the intake process. Due to staffing issues, inventorying the property can take time.

Brandt testified that he had spoken to Jones about his refusal to leave restrictive housing. Jones indicated that he feels threatened in general population, and Brandt has offered to help him get approved for protective custody. Brandt testified it was his personal belief that Jones wants to be in a single-man cell. Although Jones would have a single-man cell during the intake process for protective custody, he would ultimately be assigned a cellmate. Brandt testified that Jones specifically stated that he did not want a cellmate. Before being placed with a cellmate in protective custody, an inmate is screened to ensure that he is not placed with a rival gang member. Staff also take into account an inmate's size, stature, medical issues, and mental health when determining cellmate assignments.

As of the date of the hearing, Brandt indicated that Jones had all of the allowable property for restrictive housing. The allowable items include sheets, blanket, pillow, mattress, hygiene products, undergarments, boxers, t-shirts, and thermal underwear. He may also have legal work and reading materials to the extent the items fit in a single legal correspondence box. He can also have his tablet. Brandt testified that inmates are only allowed one jumpsuit in restrictive housing but are offered laundry services once a week. Brandt spoke with North 2 property officers who indicated that Jones had all of his allowable

property. He admitted that he was on Jones's gallery the morning of the hearing but did not
go to his cell.

### 3. *Matthew Plummer*

The current warden of Menard, Matthew Plummer, also testified about Jones's access
to property in restrictive housing. Plummer has been day-to-day warden at Menard since
December 26, 2025. He is familiar with North 2 restrictive housing and knows that there are
approximately 300 cells across 10 different galleries. He testified that restrictive housing is
for individuals who have committed policy infractions and is not meant for those inmates
who simply do not want to be housed in general population. The unit is designed to correct
behavior, and space is limited.

As to Jones, Plummer testified that he was familiar with him, but he had not
previously met Jones in person. Plummer testified that he relied on his staff in North 2 to
verify that Jones had his property. Plummer noted that they could conduct a cell search and
verify the presence of the property, but there were also inventory sheets for restrictive
housing that listed the property in his possession. An inmate is also supposed to sign a receipt
when property is inventoried and returned to the inmate. Plummer testified that when
property is confiscated for inventory and search purposes, it is returned as soon as possible
depending on how many other inmates are in intake status and the activities taking place
throughout the prison on a certain date.

### 4. *Carri Morris*

Carri Morris testified that she currently works as a social worker at Menard. She
reviewed Jones's records and noted no order of crisis watch for Jones within the last 60 days.
She testified that based on her knowledge of the policies at the prison, when an inmate refuses

housing, he is issued a ticket and his property is removed. The inmate receives limited property, including a bed roll and hygiene items. Mental health staff meet with the inmate to ensure he is mentally stable and able to return to his cell. Morris testified that this is the policy even for inmates who refuse housing at the end of their stay in restrictive housing and are readmitted to restrictive housing. She noted that it was not a new policy, it has been the process since she has been at Menard. Morris noted that she was familiar with the process because Jones is not the only inmate who has refused housing; it is a common practice among inmates and they are issued another ticket, removed from their cell, and assessed by mental health staff. Mental health staff have no control over what property an inmate is able to keep in restrictive housing.

### F. Additional Briefing

At the close of the hearing, the Court directed defense counsel to produce the inventory sheets and receipts for the return of Jones's property. The Court also noted that no one had looked in Jones's cell to determine what property he had in his possession. On March 3, 2026, Matthew Plummer filed a supplemental brief. Counsel for Plummer noted that while she had indicated at the hearing that Jones was not currently on restricted property status, she clarified that inmates in restrictive housing are limited to the restricted property identified in the July 1, 2016 memorandum (Doc. 43, pp. 2-3; Doc. 38-4). Jones is subjected to restricted property because he continues to refuse housing (*Id.*).

Plummer also offered the affidavit of Jeremy Demond, a major who participates in tactical shakedowns (Doc. 43-1). Demond stated that on February 26, 2026, during a shakedown of North 2, 6 Gallery, he had a chance to observe Jones's cell and property (Doc. 43-1, p. 1). Demond noted that Jones had a mattress, sheets, blanket, clothing including

t-shirt, underwear, and shower shoes, a towel, face cloth, mail, and hygiene items including shampoo, soap, toothpaste, toothbrush, and toilet paper (*Id.*). He also noted that Jones's tablet was scheduled to be returned to him on that date. Jones initially accepted the tablet but returned it because he claimed he did not have the charger.

A February 27, 2026 incident report indicates that Jones handed Correctional Officer Brittingham his tablet, informing Brittingham that he received his tablet yesterday but did not receive his charger (Doc. 43-1, p. 4). Jones informed Brittingham that he did not want the tablet until he could have the charger (*Id.*). Brittingham returned the tablet to North 2 property. Roughly an hour later, Lieutenant Lynch issued another incident report, noting that he tried to return Jones's tablet, but he again insisted that he did not want his tablet because it lacked the charger (*Id.* at p. 3). Lynch spoke with Officer Chandler in property, and Chandler indicated that both the tablet and the charger were returned to Jones on February 26, 2026 (*Id.*). Lynch again tried to return the tablet and Jones refused, stating that he did not want the tablet (*Id.*). Lynch returned the tablet to the property department.

Defendant Erin Nicholson also filed a supplement reiterating that Jones has received mental health care (Doc. 44).

## LEGAL STANDARDS

A temporary restraining order may issue without notice only if "specific facts in an affidavit or a verified complaint clearly show that immediate or irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition." FED. R. CIV. P. 65(b)(1)(A). Such injunctive relief is also warranted "to prevent a substantial risk of serious injury from ripening into actual harm." *Farmer v. Brennan*, 511 U.S. 825, 845 (1994). The same legal analysis is used to determine whether a TRO or a preliminary injunction is

warranted.

A preliminary injunction is an "extraordinary and drastic remedy" for which there must be a "clear showing" that a plaintiff is entitled to relief. *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (quoting 11A Charles Alan Wright, Arthur R Miller, & Mary Kay Kane, Federal Practice and Procedure §2948 (2d ed. 1995)). The purpose of such an injunction is "to minimize the hardship to the parties pending the ultimate resolution of the lawsuit." *Faheem-El v. Klincar*, 841 F.2d 712, 717 (7th Cir. 1988). A plaintiff has the burden of demonstrating (1) a reasonable likelihood of success on the merits; (2) no adequate remedy at law; and (3) irreparable harm absent the injunction. *Planned Parenthood v. Commissioner of Indiana State Dep't Health*, 699 F.3d 962, 972 (7th Cir. 2012).

As to the first hurdle, the Court must determine whether "plaintiff has any likelihood of success—in other words, a greater than negligible chance of winning." *AM General Corp. v. DaimlerChrysler Corp.*, 311 F.3d 796, 804 (7th Cir. 2002). Once a plaintiff has met his burden, the Court must weigh the balance of harm to the parties if the injunction is granted or denied and also evaluate the effect of an injunction on the public interest. *Id.*; *Korte v. Sebelius*, 735 F.3d 654, 665 (7th Cir. 2013). "This equitable balancing proceeds on a sliding-scale analysis; the greater the likelihood of success of the merits, the less heavily the balance of harms must tip in the moving party's favor." *Korte*, 735 F.3d at 665. In addition, the Prison Litigation Reform Act provides that a preliminary injunction must be "narrowly drawn, extend no further than necessary to correct the harm . . . ," and "be the least intrusive means necessary to correct that harm." 18 U.S.C. § 3626(a)(2). Finally, pursuant to Federal Rule of Civil Procedure 65(d)(2), a preliminary injunction would bind only the parties, their officers or agents, or persons in active concert with the parties or their agents.

## DISCUSSION

Jones seeks the return of his property while in restrictive housing and an injunction prohibiting officials from enforcing the strip-out policy against him when he refuses housing. He argues that his property, including hygiene items, was improperly taken from him, and he is unable to clean himself and suffers mental distress as a result.

But Jones fails to demonstrate that he is likely to succeed on the merits of his claims regarding his access to his property. In order to succeed on a conditions of confinement claim, Jones must demonstrate that he was denied "the minimal civilized measure of life's necessities," creating an excessive risk to his health or safety. *Farmer*, 511 U.S. at 834. The objective conditions must have resulted in an unquestioned and serious deprivation of basic human needs such as food, medical care, sanitation, or physical safety. *Rhodes v. Chapman*, 452 U.S. 337, 347-48 (1981). "[E]xtreme deprivations are required to make out a conditions-of-confinement claim." *Giles v. Godinez*, 914 F.3d 1040, 1051 (7th Cir. 2019) (quoting *Hudson v. McMillian*, 503 U.S. 1, 9 (1992)). Whether such conditions are sufficiently cruel and unusual is judged by "contemporary standards of decency." *Id.*

Jones's motions alleged that he lacked access to basic sanitation and hygiene items. In fact, the Court set the evidentiary hearing because Jones argued that he was denied access to toilet paper, showers, and hygiene items leading him to develop rashes and an odor (Doc. 4, pp. 2, 9; Doc. 30, p. 3). But, at the evidentiary hearing, Jones acknowledged that he had access to toilet paper, a body towel, sheets, blanket, mattress, a bar of soap, toothbrush, shower shoes, and recently received mail. He further admitted that he had not taken a shower in 20 years, but this decision was of his own free will. Jones acknowledged that he is offered shower opportunities but prefers to take sponge baths in his prison sink. Jones's testimony

Page **18** of **22**

regarding his access to basic hygiene items is consistent with Brandt's testimony that inmates placed in restrictive housing initially receive basic hygiene items including bedding, soap, and toilet paper until the remainder of their property is inventoried and returned. There appears to be no dispute that Jones has access to these basic necessities.

Instead, Jones mainly takes issue with his lack of access to his remaining personal property. He also disapproves of the process of removing and inventorying his property every 28 days. Jones testified that when he again refused housing on February 5, 2026, he lost access to certain property including a change of underwear, additional clothing, deodorant, toothpaste, and his tablet. The parties acknowledge that these items are allowable items for restrictive housing, but there is a dispute over whether Jones currently has access to these items. These items are taken when an inmate refuses housing as part of the restrictive housing intake process. It is inventoried and then returned.[4] Sometimes the inventory process can take time depending on staff levels in the unit. The Court finds Brandt's testimony on this point to be credible. In fact, all three staff members testified that this is the process for inmates who refuse housing. There is no evidence that staff are targeting Jones by utilizing this process. Although Jones may dislike this process, there is no evidence that it is being done arbitrarily or as a form of retaliation. It is also clear that he receives basic hygiene items while his property is being inventoried. He has access to a shower and laundry services for the clothes he maintains in his possession. There is clearly a dispute as to whether he currently

---

[4] Although the Court directed defense counsel to submit the inventory sheets and receipts mentioned during the evidentiary hearing, those documents were not included in the supplemental response (Doc. 43).

has access to his other personal items,[5] but even assuming that he does not presently have these personal items, his lack of access to these items does not amount to a denial of life's basic necessities. *Snipes v. Witthrop,* Case No. 05-cv-909-WDS, 2007 WL 2229012, at *2 (S.D. Ill. Aug. 2, 2007) ("Although [the lack of deodorant] may have made his life unpleasant, nothing in the Constitution requires a prison life to be pleasant, and his rights under the Eighth Amendment were not violated by the lack of deodorant."); *Herzog v. Rutkowski*, Case No. 1:25-CV-84-GSL-AZ, 2026 WL 40069, at *2 (N.D. Ind. Jan. 5, 2026) ("The use of deodorant does not improve cleanliness; its usefulness is merely cosmetic.") (citation omitted); *Passmore v. Josephson*, 376 F. Supp. 3d 874, 882-83 (N.D. Ill. 2019) (receipt of dirty underwear did not amount to a sufficiently serious condition when inmate had ability to wash the underwear and failed to substantiate a serious medical condition as a result of wearing the underwear).

Jones also argues that the loss of property exacerbates his mental health, making him angry and prone to self-harm, but the evidence demonstrates that he has access to mental health services. He is evaluated by mental health staff every time he refuses housing and is re-admitted to restrictive housing (Doc. 38-7, pp. 4-8). He also acknowledged that mental health staff make rounds through his unit. Jones fails to demonstrate that his current conditions violate the Eighth Amendment or that he will face irreparable harm if an injunction is not entered. *See Giles*, 914 F.3d at 1051-52 (conditions mentally ill inmate faced in segregation did not violate the Eighth Amendment when he was evaluated by mental

---

[5] Matthew Plummer's supplemental response indicates that Jones's tablet was returned on February 26, 2026, and he had underwear, t-shirts, a face cloth, toothpaste, and toothbrush in his possession, in addition to the items that Jones testified at the hearing that he had in his possession.

health professionals at the prison to ensure that his condition did not contraindicate his continued placement in segregation).

Finally, the Court notes that the conditions Jones faces are of his own volition. He is not supposed to reside in restrictive housing; the unit is meant for correcting behavior, as Warden Plummer testified, and not for those who want to refuse housing. Jones could avoid the loss of his property by leaving restrictive housing and transferring either to general population or protective custody. Brandt testified that he offered to help Jones with the paperwork to check in to protective custody. Jones argues that he faces danger both in general population and protective custody, but his evidence regarding threats to his safety are speculative. Jones was unable to identify a single individual who posed a threat to his safety. Although he noted in his Complaint that his victim's brother is housed at Menard, Jones was unable to identify this individual or his current location. He only knew his nickname, and he was unable to state whether the individual was still present at Menard. Jones also indicated that he was previously in a gang and received threats from numerous gang members and from members of other gangs. But again, he was unable to identify these individuals. He testified that inmates in protective custody pose a threat to him because of a former nickname, but it is not clear that anyone in the unit even knows him or his nickname. Further, Brandt testified that inmates and potential cellmates are screened prior to placement to ensure safety and compatibility. Brandt testified that he believes that Jones wants to remain single-celled, which is not feasible in protective custody. There is no evidence that Jones faces a specific threat in either location.

Jones fails to demonstrate that he is likely to succeed on his claim that the policy of confiscating property violates his constitutional rights. Nor is there any indication that he

will suffer irreparable harm without an injunction because he has access to basic hygiene supplies and medical care. Further, Defendants have demonstrated that his continued residence in restrictive housing violates prison rules, and an injunctive order regarding continued placement in restrictive housing and access to his personal property would violate those prison rules. Thus, an injunction in this case is not warranted.

**CONCLUSION**

For the reasons stated above, Jones's motions for injunctive relief (Docs. 4, 11, 36) are **DENIED**.

**IT IS SO ORDERED.**

**DATED:  March 12, 2026**

_____

**NANCY J. ROSENSTENGEL**
**United States District Judge**